## SLOCOMB, RICHARDS & CO. VS. BLACKBURN ET AL.

Where personal property is levied upon, and, by direction of the plaintiff, the sheriff permits it to remain in possession of the defendant, and returns the execution without a sale, the levy will not continue to be a lien as against intervening rights of other persons; and against other creditors is regarded as dormant and fraudulent.

A judgment creditor issued execution which was levied upon slaves; the defendant gave a delivery bond (under the act of 29th March, 1839,) which was returned forfeited, but no judgment was taken on the bond: no further process was sued out upon the judgment for more than five years, when the plaintiff caused *fi. fa.* to be issued—taking no notice of the levy previously returned: after the lapse of more than seven years from the time of the return of the delivery bond forfeited, and after the death of the defendant, the plaintiff files a bill in equity, against a party in possession under claim of title, without showing diligence or sufficient excuse for the delay, to enforce a specific lien upon the slaves under the original execution and levy: *Held* that the claim to a specific lien was not well founded.

*Quere.* Could a specific lien upon personal property, created by the levy of an execu-

tion in the life-time of the judgment debtor, be enforced by a Court of equity, after his death, without administration, or regard to our Probate Court system?

Under the provisions of our probate system, upon the death of any person, his estate passes into the hands of the law, to be administered for the benefit of creditors, etc., according to their priorities: and no one creditor has a right to come into a Court of equity to set aside conveyances of property, made by the deceased debtor, as fraudulent and void as against creditors, and subject such property to the payment of his own debt, without regard to our probate system, or the rights of other creditors.

*Appeal from Pulaski Circuit Court in Chancery.*

The Hon. WILLIAM H. FEILD, Circuit Judge.

This cause was argued at length by the counsel on both sides upon points made as to the validity of the deeds of settlement.

TRAPNALL for the appellants.

PIKE & CUMMINS, and WATKINS & GALLAGHER, for the appellees, also contended that there was no lien upon the slaves after the return of the execution and forfeited delivery bond: that the lien created by the levy was lost; that an execution is a lien only while it is in the hands of the officer unless the property is in his possession by a subsisting levy, (*Rev. Stat. ch.* 67, *sec.* 2; *Biscoe et al. vs. Sandefur et al.* 14 *Ark.* 568; 15 *Ark.* 274; *Daniel vs. Cochran,* 4 *Bibb.* 532; *Malone vs. Abbott,* 3 *Humphrey's* 532,) and it was only upon the footing of a lien upon the property that chancery would have jurisdiction, (*Story's Eq. Pl. sec.* 257; *Mitt. Eq. Pl. by Jeremy* 126, 187, 188; 1 *Vern. R.* 399:) that as the bill was filed after Marshall's death, the only way a creditor could reach the property would be by an administration (*Lemon's heirs vs. Rector et al.* 15 *Ark.* 436.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 21st of March, 1848, Slocomb, Richards & Co., filed a bill in the Pulaski Circuit Court, against Samuel D. Blackburn, Eliza Marshall, widow; and James D. B., and John G. Marshall,

infant heirs of Gilbert Marshall, deceased. The case made by the original bill is substantially as follows:

On the 21st March, 1837, Gilbert Marshall and David Titsworth, who were then engaged as partners in the mercantile business, in Scott county, purchased of the complainants at New Orleans, a bill of goods, for which they made their note for $1,372 57, due at twelve months, etc. On the 14th April, 1838, Marshall purchased another bill of goods of complainants, for which he gave his individual note for $370 52, payable at twelve months.

On the 1st July, 1839, the complainants commenced suit, in the Scott Circuit Court, against Marshall and Titsworth on the first note, and against Marshall on the second note: and on the 1st of October of the same year, obtained judgment in both suits, etc.

On the 28th of August, 1840, a *fi. fa.* was issued on each of said judgments to the sheriff of Scott county, returnable to the September term following: which were levied on two slaves, *Sam* and *Nathan*, and some lots and land, in and near Boonville, as the property of Gilbert Marshall.

In the mean time, the bill alleges, Gilbert Marshall, on the 20th Dec., 1858, being deeply in debt and pressed by his creditors, and about to enter into marriage with Eliza Blackburn, conveyed to Samuel D. Blackburn, for her use, all his personal and real estate, leaving nothing to pay his debts, etc. In which conveyance was embraced the property levied on as above.

After the levy was made, Blackburn, as trustee in the deed of settlement, claimed the property; the sheriff summoned a jury to try the right of property, and they rendered a verdict that the slaves were subject to the executions. The real property levied upon was sold by the sheriff for a small sum; but the time for selling under the executions had expired before the conclusion of the trial of the right of property, and the slaves were not sold for the want of time.

On the 2d of October, 1840, a *venditioni exponas* was issued on each of the judgments, to the sheriff of Scott county, commanding him to sell the slaves *Sam* and *Nathan*, etc., etc., re-

turnable to the March term, 1841. The sheriff returned that he had surrendered the possession of the slaves, on the execution of a delivery bond by Marshall, etc., which had been forfeited, etc.

The bill further alleges that shortly after the delivery bond was given, the slaves were removed from Scott county, by Sam'l D. Blackburn, and complainants were not aware what had become of them, until sometime in the year 1846, when they were informed that they were on a farm of Blackburn's in Pulaski county, about twenty miles above the city of Little Rock. Whereupon, on the 14th Sept. 1846, complainants caused a *fi. fa.* to be issued on each of said judgments to the sheriff of said county, returnable to the October term following. That the slaves were kept out of the way of the sheriff, and though he made diligent search for them, being directed so to do, yet they could not be found, and the executions were returned *nulla bona*, etc.

Afterwards, Gilbert Marshall departed this life intestate and insolvent, and there was no administration upon his estate. In the year 1842, he removed from Scott to Pulaski county, and lived from that time until his death near the farm of Blackburn, and had the use or possession of the slaves *Sam* and *Nathan*. After his death, they were in possession of Blackburn.

Titsworth had also died insolvent.

The bill charges that the deed of settlement was made to hinder, delay and defraud the creditors of Gilbert Marshall, and was therefore void. That the levy of said writs of *fi. fa.* on the slaves *Sam* and *Nathan* had never been disposed of: and still remained a specific lien on them; and that they were taken from Scott county, by Blackburn, as above stated, with a full knowledge of that fact, and for the purpose of defeating the lien.

The bill prays for a decree subjecting the slaves *Sam* and *Nathan* to the lien, and in satisfaction of the judgments.

Mrs. Marshall, in her answer, sets out the marriage contract entered into between Gilbert Marshall and herself, (then Eliza Blackburn) and exhibits the deed of settlement of 20th December, 1838, referred to in the bill—by which, in pursuance of the

OF THE STATE OF ARKANSAS. **313**

TERM, 1857.]    Slocomb, Richards & Co. vs. Blackburn et al.

treaty of marriage, and in consideration thereof, Marshall conveyed to Samuel D. Blackburn, as trustee, for the use of said Eliza during her life, etc., the slaves *Sam* and *Nathan*, and two other negroes, and a tract of land, etc., remainder in common to Mary J. and William H., children of Marshall by a former marriage, and to any children that he might have by the said Eliza, share and share alike.

Mrs. Marshall furthermore states in her answer that when the deed was executed, nor at any time previous to her marriage with Marshall, had she any knowledge that he was indebted to complainants, or any other person. In view of his advanced age, she made it a condition of the marriage, that he should settle upon her, and any children that she might have by him, such property as would secure to them a comfortable support. She denies all fraud and intention to defeat the claims of the creditors of Marshall on her part, etc. Marshall died in October, 1847. His son, William H., mentioned in the deed, died before his father. But one of the issue of the marriage, the defendant John G. was living. The trustee always had possession and control of the property until the death of Marshall, since when she had controlled it. She denies that the levies were, or continued liens on the slaves, etc.

On the 9th of June, 1849, the complainants filed an amended bill, in which they set out more fully than in their original bill, the provisions of the deed of the 20th Dec., 1838: and also set out and exhibit another deed of settlement made by Marshall on the 27th of Sept., 1839, after the marriage, but purporting to have been executed in pursuance of the ante-nuptial contract, in which he conveys to Blackburn, as trustee, for the use of Mrs. Marshall for life, several other slaves and personal property, remainder in common to the two children of Marshall named in the first deed, and to any children of the marriage, etc. This deed, as well as the first, is charged to have been made in fraud of the rights of Marshall's creditors; and the bill prays that both deeds may be decreed to be null and void, and the property embraced therein sold for the satisfaction of complainants' judgments, etc.

21

**314** CASES IN THE SUPREME COURT

Slocomb, Richards & Co. vs. Blackburn et al.     [JANUARY

Blackburn, the trustee, answered the original and amended bill at great length, but we deem it unnecessary here to state the substance of the answer. By agreement, the answer of Mrs. Marshall to the original bill was taken as an answer to the amended bill. A formal answer was also interposed for Mary J., and John G. Marshall, by their guardian *ad litem*.

On the 23d January, 1852, complainants filed a supplemental bill, stating that Mrs. Marshall had intermarried with one Blunt, and making him a party. That in April, 1851, she conveyed all her interest in the property embraced in the two deeds, to John G. and Mary J. Marshall, who were entitled to the remainder, after the termination of her life estate, under the provisions of the deeds. Prayer as in the original and amended bills.

Mrs. Blunt answered the supplemental bill, admitting that she had made a voluntary conveyance of her interest in the property, as alleged, etc.

On the 9th of December, 1852, her death was suggested and admitted.

The cause was finally heard in June, 1853, on the pleadings and evidence, and the bill dismissed for want of equity. Complainants appealed to this Court; after which, Sam. W. Williams, having intermarried with Mary J. Marshall, was made a party.

The life interest of Mrs. Marshall (or Blunt) in the property in controversy, having terminated, the contest is now between the appellants, as creditors of Gilbert Marshall, deceased, and his only surviving children, Mrs. Williams and John G. Marshall, who now claim absolute title to the entire property, under the provisions of the deeds of settlement, etc.

In the original bill, the appellants insist that they acquired a specific lien on the slaves *Sam* and *Nathan*, during the lifetime of Marshall, by virtue of the execution levies; that the levies remained undisposed of, and the lien continued and was in force after the death of Marshall, and when the bill was filed; and that therefore they had the right to proceed by bill in equity to enforce the lien, and subject the slaves to the satisfaction of

their judgments at law, without administration upon the estate of Marshall, and regardless of the claims of other creditors.

Did the lien of the levies continue in force as insisted?

The delivery bond given by Marshall was returned forfeited, at the March term, 1841. The bond was executed under the provisions of the act of 20th March, 1839, (*Dig*. *ch*. 67, *sec*. 37 to 42,) and its forfeiture did not operate as a judgment, or merger of the original judgment, as under the law now in force. *Biscoe et al. vs. Sandefur, ad. et al.*, 14 *Ark. R.* 568. The plaintiffs had the right to proceed by motion, or suit, for judgment on the forfeited bond, or to sue out further process of execution upon the original judgments, as they might elect. *Ib.* 585.

The record fails to show that appellants obtained any judgment upon the forfeited bond, and therefore it must be supposed that the original judgments continued in force. But after the return of the bond forfeited, no further process appears to have been issued, until the 14th of Sept., 1846, a period of more than five years, when a *fi. fa.* was issued upon each of the judgments to the sheriff of Pulaski.

The act of 20th March, 1839, (*Dig*. *ch*. 67, *sec*. 38.) provides that " if the property be not delivered according to the condition of the bond, the *levy shall remain a lien upon the property* taken for the satisfaction of the judgment into whose possession soever the same may have passed." And *sec*. 39, of the same act, declares that " the officer may seize the same property wherever it may be found, or any other property of the defendant subject to the execution, and sell the same, if personal property, on five days' notice, to satisfy the execution." But *how long* the *levy shall remain a lien* upon the property, the act does not provide. The statute being silent as to this, the duration of the lien must be determined by reference to such analogous principles of law as may be applicable.

Our law does not favor the continuation of such liens for an unreasonable time. The lien of a judgment upon real estate is limited to three years. In *State Bank vs. Etter*, 15 *Ark.* 269 an execution issued from Pulaski to the sheriff of Hempstead, was levied on land, and returned without sale, by order of the

**316**     CASES IN THE SUPREME COURT

Slocomb, Richards & Co. vs. Blackburn et al.     [JANUARY]

plaintiff. The defendant died, and his administrator afterwards sold the land. The plaintiff afterwards attempted to enforce the lien of the levy by *ven. ex.*, and this Court held that plaintiff having directed the return of the execution without sale after the levy, and taken no steps to revive the judgment against the administrator, and sued out no process for the satisfaction of the judgment for two years and a half after the levy, and near fifteen months after the land had been sold by the administrator, the lien of the levy was lost. The Court remarked that as to judgments: " The statute has limited the continuance of the lien, but with regard to execution liens, the statute is silent, and the Court must necessarily determine, from delay and other circumstances, whether the lien has been waived or abandoned."

Where personal property is levied upon, and, by direction of the plaintiff, the sheriff permits it to remain in possession of the defendant, and returns the execution without a sale, the levy will not continue to be a lien as against intervening rights of other persons. *Whipple vs. Foot*, 2 *John. R.* 422. *Storm vs. Woods*, 11 *Ib. Kellogg vs. Griffin*, 17 *Ib.* 276. *Brown vs. Cook*, 9 *Ib.* 361. *Commonwealth vs. Stremback*, 3 *Rawle* 341. *Collins vs. Stanbridge*, 5 *Ib.* 286. *Snyder vs. Beam*, 1 *Browne* 366. Such lien is regarded as dormant and fraudulent as against other creditors, etc. *Cornell vs. Cook*, 7 *Cowen* 315.

Perhaps, upon principle, where goods are levied on, a delivery bond taken, and returned forfeited at the return term, and the plaintiff permits the next ensuing term of the Court to pass without taking out process to enforce the lien of the levy upon the goods, he might, by such neglect, lose his lien as against any intervening rights of other creditors or purchasers, etc. But be this as it may, in this case, the appellants sued out no process upon their judgments for more than five years after the return of the bond forfeited, and then they caused *fi. fa's* to be issued, taking no notice of the levies previously returned. Nor did they file this bill to enforce their alleged lien in equity, until the lapse of seven years from the time the bond was returned forfeited; a period sufficiently long to bar an action at law

for the slaves, had they acquired a title to them, instead of a lien upon them, by the levies, etc.  Under such delay, we know of no principle upon which the lien could be held to continue so long as against other creditors, or the parties here contesting.

The bill, however, alleges as an excuse for the delay, that Blackburn, the trustee in the deed of settlement, removed the slaves from Scott to Pulaski county, shortly after the execution of the delivery bond, and appellants were not aware of where they were until sometime in the year 1846, when they sued out the *fi. fa's*, etc.  The appellants were non-residents of the State, and had perhaps no personal knowledge of the matter, but it does not appear that their attorneys, who resided here, and had charge of their claims, used any diligence in the premises, or if any, what.  The deed of settlement was executed, and recorded in Scott county before the appellants brought their suits at law against Marshall.  The slaves were levied upon regardless of the deed.  The beneficiaries in the deed did not consent to the levy, the trial of the right of property, or the execution of the delivery bond.  At least the record before us shows no such consent on their part.  The deed gave to Blackburn, as trustee, the possession and control of the slaves, for the use and benefit of the *cestui que trusts*.  Upon the face of the deed, recorded as above stated, it was recited that he resided in Pulaski county.  He says, in his answer, that in the discharge of what he regarded as his duty, as such trustee, he removed the slaves from Scott to Pulaski county, and there openly, and without concealment, managed, controlled and employed them for the benefit of the beneficiaries.  Marshall, himself, the bill states, removed to Pulaski county in the year 1842, and continued to reside there from thenceforward until his death.  Under all these circumstances, it would seem that ordinary diligence on the part of appellants, or their attorneys, would have enabled them to ascertain the necessary information to commence proceedings at law or in equity, long before they did, to enforce their alleged lien.  Blackburn denies any fraudulent

removal or concealment of the slaves, on his part, and none is proven by the depositions read upon the hearing.

Upon all the facts of the case, we think the claim of appellants to a specific lien upon the slaves *Sam* and *Nathan*, as insisted upon in the original bill, is not well founded.

If the appellants had a specific lien upon the two slaves, as insisted, whether they could have enforced it in equity, and condemned the slaves to the satisfaction of their judgments, without administration upon Marshall's estate, and without regard to our peculiar probate system, we do not mean now to decide. See *State Bank vs. Etter, ubi sup.*

In the amended bill it is not pretended that appellants had acquired any lien whatever, during the life of Marshall, upon any of the property embraced in the two deeds of settlement, other than the slaves *Nathan* and *Sam*. The appellants, alleging the deeds to be fraudulent and void as against Marshall's creditors, seem to have taken it for granted that they had the right to proceed by bill in equity to subject the whole of the property to the payment of their judgments, without regard to our probate system, or to the rights of other creditors.

It appears that Marshall died insolvent, but he left some property, which was not embraced in the deeds, and he was considerably indebted to other creditors besides the appellants. He failed in the mercantile business in Scott county, which it seems he carried on extensively, and perhaps most of his debts, which remained unpaid at his death, were contracted before, or about the time of his marriage with Miss Blackburn. None of the mercantile assets were embraced in the deeds. It is to be inferred from the depositions in the cause, that if the deeds were fraudulent and void as to appellants, they were also as to other creditors; and such other creditors would have an equal claim with appellants to the payment of their debts, out of any assets left by Marshall, subject to the demands of his creditors.

Under the provisions of our probate system, upon the death of any person, whether solvent or insolvent, his estate passes into the custody of the law, to be administered for the benefit

of creditors, etc. 'All claims against the estate are allowed and classed in the Probate Court, and are paid according to priority, or *pro rata*, if the estate be insolvent, and in full of solvent, by the executor or administrator, under orders of the Court, and the balance, if any, is distributed, etc., to heirs, etc. *Walker as ad. vs. Byers*, 14 *Ark. R.* 252. *Adamson et al. vs. Cummins*, 5 *Eng R.* 541. *State Bank vs. Etter*, 15 *Ark. R.* 268.

In some matters touching the administration of estates, under this system, the Court of Chancery has a jurisdiction auxiliary to that of the Probate Court; in others a concurrent, and in some matters a supervisory jurisdiction. But distributees, creditors, etc., of estates are not permitted to convert the Court of Chancery into a Probate Court, disregarding the administration system, and the appropriate jurisdiction of the Probate Court, as established by law, under the provision of the constitution. See *Lemon's heirs vs. Rector et al.*, 15 *Ark.* 436. *Pryor vs. Ryburn*, 16 *Ib.* 671. *Anthony vs. Peay, et al.*, 17 *Ib. Barasien vs. Odum*, *Ib.*

We think the case now before us falls within the principles settled by these decisions. If an administration had been granted upon Marshall's estate, the appellants might have availed themselves of the auxiliary jurisdiction of the Court of Chancery to determine the validity of the deeds in question, etc. They might have filed a bill for the benefit of themselves and the other creditors against the administrator, the trustee and beneficiaries in the deed; and if the deeds had been adjudged to be fraudulent and void, the property might have been subjected, by decree, to the satisfaction of the claims of all the creditors, according to priority, etc., whose demands had been established, allowed and classed in the Probate Court, etc. See *Clark adx. et al. vs. Shelton*, 16 *Ark.* 475; *Jordan ad. vs. Fenno*, 13 *Ib.* 593.

We are not to be understood as deciding, upon the pleadings and evidence in the cause, that the deeds of settlement were fraudulent and void as against the creditors of Marshall. The

questions above settled dispose of the case, and render it unnecessary to express any opinion upon the validity of the deeds.

The decree of the Court below is affirmed.